IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **DEBORAH V. LONGCRIER,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 08-0011-WS-C** |
| | ) |
| **HL-A CO., INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on an array of pending motions, including Plaintiffs'
Motion for Conditional Class Certification and to Facilitate Court-Approved Notice (doc. 38),
Plaintiffs' Motion to Toll Statute of Limitations (doc. 41), Defendant's Motion to Strike Certain
Documents (doc. 46), and Plaintiffs' Motion to Strike and/or Motion for Protective Order (doc.
52). All of these motions are contested and have been the subject of extensive briefing and
evidentiary submissions. They are now ripe for disposition.[1]

**I.      Background.**

In their First Amended and Restated Complaint (doc. 37), the six named plaintiffs

---

[1]      In at least two of its filings, defendant has proceeded in derogation of Paragraph
13 of the Rule 16(b) Scheduling Order (doc. 19) and Local Rule 7.1(b), which provide that briefs
in support of or in opposition to motions "shall not exceed thirty (30) pages in length." In
addition to exceeding the page limit without leave of court, those filings utilize dozens of tiny-
font footnotes, creating the illusion that they exceed the upper bound of the page limitation by a
smaller margin than they actually do. Plaintiffs make the same error in at least one of their
filings, adopting a tiny footnote font size in a brief that would otherwise have exceeded the
established page limitations. Such practices contravene the typeface requirements of Local Rule
5.1, which make no allowance for shrinkage of font sizes within footnotes. In its discretion, the
Court has considered the parties' submissions as filed, notwithstanding their nonconformity with
the Local Rules; however, counsel are admonished to be more attentive to those requirements in
future filings.

(collectively, "Plaintiffs"),[2] seeking to proceed on behalf of themselves and others similarly situated, brought claims against defendant, HL-A Co., Inc. ("HL-A"), for alleged violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA").  All Plaintiffs are alleged to be hourly, nonexempt employees who are or were employed by HL-A in various capacities at its automobile parts manufacturing facility in Selma, Alabama.

The three specific FLSA violations enumerated in the Amended Complaint are as follows: (a) a claim that HL-A willfully violated the FLSA by causing or allowing Plaintiffs and similarly situated employees to work "off the clock" without pay during scheduled 30-minute lunch breaks, in violation of 29 C.F.R. § 785.19;[3] (b) a claim that HL-A willfully violated the FLSA by adopting a rounding policy pursuant to which Plaintiffs' and similarly situated employees' time worked was always rounded down to the 15-minute increment that most favored the employer, in violation of 29 C.F.R. § 785.48(b); and (c) a claim that HL-A willfully violated the FLSA by requiring Plaintiffs and other similarly situated employees to work "off the clock" prior to and subsequent to their scheduled work shifts for HL-A's benefit, without additional compensation.[4]  With respect to each of these alleged violations, Plaintiffs' theory is

---

[2]        The six named plaintiffs are Deborah V. Longcrier, Gregory Pickett, Dale F. Bell, Calvin Clark, Rosie Brown, and Robert Pettus, Jr.  In addition, plaintiffs' counsel has filed consent forms from approximately 80 other nonexempt employees expressing their consent to become parties plaintiff in this FLSA action.  (*See* docs. 16, 17, 18, 20, 21, 28, 34, 56.)

[3]        As the Court understands it, this claim has two components.  First, Plaintiffs appear to be asserting that HL-A's failure to pay them for work performed during the 30 minutes allocated for the meal period violates the FLSA because the time they actually spent working was uncompensated.  Second, Plaintiffs appear to be arguing that HL-A's failure to provide them with an uninterrupted meal period invalidates the entire 30-minute automatic deduction from their pay under the FLSA because a sub 30-minute meal period may not be *bona fide* under 29 C.F.R. § 785.19.

[4]        In addition to these three FLSA claims that lie at the epicenter of the Motion for Conditional Class Certification, the Amended Complaint also interposes an FLSA claim predicated on deductions for late or early clocking (which plaintiffs have apparently folded into their claim for rounding violations, as this theory of relief has not been afforded separate treatment in the class certification briefing), a state-law claim for work and labor done, and a Family and Medical Leave Act retaliation claim that is, on its face, unique to plaintiff Deborah V. Longcrier.  Those causes of action are not pertinent to the pending motions and therefore will not be addressed at this time.

that HL-A, by virtue of this conduct, has failed to pay them statutorily required overtime compensation of 1.5 times their regular hourly rate for all hours worked in excess of 40 in a workweek.[5]

Count Five of the Amended Complaint is captioned "Opt-In Collective Action" and states that Plaintiffs are bringing this case "as an opt-in collective action pursuant to 29 U.S.C. § 216(b)." (Doc. 37, ¶ 48.) According to this pleading, "[t]he potential class is comprised of any and all persons employed as hourly employees by Defendant at any time during the three (3) years preceding the filing of the Complaint, January 9, 2008." (*Id.*, ¶ 49.) This claim, and Plaintiffs' attempt to proceed as a § 216(b) collective action, with court-supervised notice to prospective opt-in plaintiffs, lies at the heart of the parties' many voluminous filings in recent months.

## II.   Cross-Motions to Strike.

Before reaching the merits of the Motion for Conditional Class Certification, the Court is constrained to address the parties' respective evidentiary objections to each other's filings. To the extent that the propriety of conditional class certification hinges on the record materials before the Court, each party's objections to the evidentiary materials proffered by its counterpart must be adjudicated before the contours of the record can be fixed for purposes of the conditional class certification analysis.

### A.   *Defendant's Motion to Strike.*

In its Motion to Strike, HL-A requests that Plaintiffs' Exhibits 35, 36, and 37 be stricken because they are "unauthenticated summaries which have not been established to be based on admissible material or accurate and thus do not have any indicia of reliability." (Doc. 46, ¶ 1.)[6]

---

[5]     To elaborate, each Plaintiff purportedly works at least 40 scheduled and compensated hours per workweek. If HL-A does not pay Plaintiffs for certain additional time worked, the effect is that Plaintiffs do not receive FLSA-mandated overtime pay for all of their hours worked in excess of 40 (which they would have received were they being compensated for these "off the clock," abbreviated lunch break, and rounding hours) because they are not being paid for those "extra" hours at all.

[6]     Neither the subject exhibits nor any of the 39 exhibits that Plaintiffs filed on July 21, 2008, spanning 203 pages, have been furnished to the Court via hard copy as required by Paragraph 13(c) of the Rule 16(b) Scheduling Order (doc. 19). Indeed, while Plaintiffs did

Plaintiffs' Exhibit 35 is a spreadsheet purporting to recite plaintiff Deborah Longcrier's daily time records from July 19, 2004 through July 19, 2007, and to demonstrate and quantify discrepancies between Longcrier's actual hours worked and the lower hours for which she was compensated because of HL-A's alleged rounding and off-clock pay practices.  (Doc. 40-36, at 2-17.)  Exhibit 35 includes an estimate that Longcrier is owed 102.5 hours of overtime compensation for that three-year period, totaling $1,636.07 in unpaid overtime.  (*Id.* at 17.)[7] Plaintiffs' Brief in Support of Motion for Conditional Class Certification (doc. 39) adequately explains what Exhibit 35 is, such that its import is readily ascertainable.  (Doc. 39, at 2, 19.)

Plaintiffs' Exhibit 36 purports to summarize time records for a putative class member, Derrick Brown, and to show analogous disparities between his clock time and paid time for certain intervals in 2005 and 2006.  (Doc. 40-37, at 2-3.)  Once again, Plaintiffs' brief explains what Exhibit 36 is and how it relates to their class certification arguments.  (Doc. 39, at 2, 19.) Similarly, Plaintiffs' Exhibit 37 purports to summarize excerpts of time records of more than two dozen opt-in plaintiffs, demonstrating similar discrepancies between clock time and paid time because of rounding and/or off-clock pay practices.  (Doc. 40-38.)  As with the other two contested exhibits, Plaintiffs' briefs explain the significance and their interpretation of Exhibit 37.  (Doc. 39, at 2, 19.)

Notwithstanding the fact that the meaning of Exhibits 35 through 37 is quite plain, and that these exhibits are on their face summaries of records that HL-A itself furnished to Plaintiffs during the discovery process, Defendant objects to all three summaries for not having been

---

comply with ¶ 13(c) with respect to their 448-page supplemental evidentiary submission and their 115-page submission in support of their motion to strike, they did not do so with respect to their initial submission.  Counsel are reminded of their obligation to provide courtesy hard copies directly to chambers of evidentiary submissions that exceed 50 pages in the aggregate.

[7]    When Defendant challenged the admissibility of Plaintiffs' Exhibit 35, Plaintiffs reexamined that exhibit and concluded that it understated the extent of Longcrier's lost earnings caused by HL-A's alleged rounding violations.  On that basis, Plaintiffs submitted a new Exhibit 35 styled "Corrected Analysis of Longcrier records," and indicating that Longcrier is actually owed 195.25 unpaid hours (including 50.25 straight-time hours and 145.00 overtime hours), for a total of $2,764.08 in unpaid compensation.  (Doc. 50, at Exh. 35.)  The discrepancy is not material to the pending motions; therefore, the Court declines to examine those calculations in detail or pass judgment on the veracity of one set of computations versus the other at this time.

authenticated in accordance with Rule 901, Fed.R.Evid., and for lacking proper foundation that the summaries are accurate.

There are at least three flaws with Defendant's argument. First, and most fundamentally, the premise undergirding Defendant's Motion to Strike, for which no authorities have been cited, is that all prerequisites of admissibility must be satisfied before these exhibits may be considered at the conditional class certification stage. But this Court is not admitting any of the parties' hundreds of pages of exhibits into evidence at this time. This case is not in trial. This is not an evidentiary hearing. The general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial. *See, e.g., Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1327 n. 2 (S.D. Ala. 2003) (documents need not be properly authenticated to be considered at summary judgment where it is apparent that they can be reduced to admissible, authenticated form at trial). Defendant has proffered no legal or equitable argument why that general rule governing consideration of exhibits should not attach here.[8]  Second, Plaintiffs have explained, and

---

[8]     That said, the Court recognizes that lower courts in other jurisdictions have reached divergent conclusions as to whether evidence not admissible in its present form may be considered in connection with a motion for conditional class certification under § 216(b). As one unpublished district court decision explained, "[t]here is presently a split in the pertinent authority as to whether the Court may properly consider inadmissible hearsay in the context of a Motion for Conditional Certification." *West v. Border Foods, Inc.*, 2006 WL 1892527, *6 (D. Minn. July 10, 2006) (collecting authorities). The better reasoned authorities allow for relaxed evidentiary standards at this early stage. *See, e.g., Crawford v. Lexington-Fayette Urban County Government*, 2007 WL 293865, *3 (E.D. Ky. Jan. 26, 2007) ("because some courts will conditionally certify collective actions under the FLSA based solely on the allegations in the complaint, courts which do require some factual support for conditional certification should take a relaxed approach to evidentiary standards they impose on the factual support provided at this stage"); *White v. MPW Industrial Services*, Inc., 236 F.R.D. 363, 368 (E.D. Tenn. 2006) ("at this preliminary stage and for these preliminary purposes, plaintiffs need not come forward with evidence in a form admissible at trial") (citation omitted). Rather than acknowledging the fractured case law in this area or pointing to relevant authorities favoring its position, Defendant would have this Court reflexively assume that only evidence satisfying all evidentiary standards for admissibility at trial may be considered at this time. The Court will not make such a leap in the absence of appropriate legal analysis by Defendant.

Defendant has never contested, that the exhibits in question "were prepared exclusively from documents provided by Defendant." (Doc. 51, ¶ 1.) Defendant does not suggest that it ever contacted Plaintiffs to discuss any legitimate concerns or questions it may have had concerning these exhibits, much less that it emerged from such discussions unsatisfied. By all appearances, then, Defendant's Motion to Strike was prompted not by *bona fide* concern that these exhibits are incomprehensible or contain fabricated data, but instead by a desire to multiply these proceedings and inconvenience Plaintiffs by obliging them to comply with a technical standard that is not required at this juncture. Third, in any event, Defendant's Motion to Strike prompted Plaintiffs to file a 448-page Supplemental Evidentiary Submission (doc. 50), including a seven-page affidavit setting forth in considerable detail the HL-A records from which the summaries were generated, the meaning of each column in those summaries, and the process through which those exhibits were prepared, as well as copies of the underlying time records from which these summaries were generated. HL-A has identified no evidentiary infirmities in Plaintiffs' supplemental materials; therefore, presumably Defendant's technical objections to Exhibits 35-37 have been allayed by Plaintiffs' curative showing.

The net effect of Defendant's Motion to Strike, then, is that Plaintiffs have been forced to perform additional work, the court file has been clogged with hundreds of pages of unnecessary backup documentation, and scarce judicial resources have been diverted to address a Motion to Strike predicated not on substantive concerns regarding the content of the summaries, but instead on dogmatic enforcement of a rigorous evidentiary standard that Defendant assumes applies to this stage of the proceedings.[9] Defendant's Motion to Strike is **denied**.

---

[9] To the extent that Defendant maintains that Exhibits 35 through 37 are "not probative of any relevant facts" because its time clock records are not an accurate representation of Plaintiffs' hours worked, Defendant is asking this Court to strike the exhibits based on a one-sided construction of disputed evidence in the light most favorable to Defendant. That Defendant apparently does not believe its own time clock records are probative of whether Plaintiffs are being compensated for all of their time worked, which is after all the focal point of the claims joined herein, is not a valid basis for striking summaries of those time records, particularly where Plaintiffs have come forward with substantial evidence that when HL-A employees clock in, they typically begin work immediately, such that the time clock records do fairly and accurately reflect their hours worked.

**B.     Plaintiffs' Motion to Strike and/or for Protective Order.**

1.     *Relevant Background.*

Plaintiffs' Motion to Strike attacks on legal, procedural and ethical grounds Defendant's Exhibit 13, which consists of 245 one-page typewritten declarations (the "Declarations") signed by HL-A employees on January 15 and 16, 2008.  (*See* doc. 48-14, at 2-246.)[10]  These Declarations are nearly identical from one declarant to the next, and contain numerous admissions by HL-A employees which on their face may be detrimental to those individuals' ability to join the action and to pursue the FLSA claims raised herein.  For example, many of the Declarations include statements such as "I have been paid by HL-A for all of the time that I have worked" or "I do not perform any work during my break" or "I do not perform work tasks until the shift begins" or "I have been paid for all the time I have worked prior to the start of my shift."  In opposing the Motion for Conditional Class Certification, Defendant would utilize these Declarations to bolster its argument that putative opt-in plaintiffs are not similarly situated to the named plaintiffs, because those putative opt-in plaintiffs have already disclaimed that their compensation was ever affected by the alleged FLSA violations for which the named plaintiffs seek relief.

Each of these Declarations includes a statement that the declarant signed same "voluntarily and without coercion."  Each Declaration also states as follows: "I understand that my participation, or failure to participate, in this interview will not affect my job.  I understand that my decision to sign or not to sign this declaration will not subject me to any reprisal or

---

[10]     The Complaint was filed on January 9, 2008; therefore, Defendant solicited these declarations from 245 of its employees approximately one week after this FLSA opt-in collective action began.  Defendant had the benefit of prior notice, too, inasmuch as Plaintiffs' counsel had been in regular contact with Defendant's counsel concerning the claims Plaintiffs intended to bring against HL-A dating back several months earlier.  (Doc. 54, at Exhs. 1-3.)  Plaintiffs' exhibits reflect that HL-A (and its attorneys) were well aware by no later than early November 2007 that a FLSA collective action was contemplated against it to challenge the specific pay practices at issue herein.  Clearly, then, these Declarations were prepared by HL-A's attorneys in anticipation of (and with actual knowledge of) this litigation.  Defendant's evidence is that HL-A employs 253 hourly employees.  (Fisher Decl. (doc. 48-3), ¶ 3.)  If that figure is accurate, then Defendant's attorneys secured declarations from virtually all of HL-A's hourly employees concerning the subject matter of this litigation on January 15 and 16, 2008, in a coordinated blitz of declaration-gathering.

detriment to my job nor result in my receiving any additional job benefits or considerations." None of the declarants had either been listed as a named plaintiff or filed a consent form in this action as of the date on which his or her Declaration was signed.[11]

Plaintiffs object to the Declarations and seek to have them stricken on the following grounds: (a) they are the fruit of improper unilateral communications between defense counsel and putative class members; (b) Defendant failed to identify the existence of the Declarations in its initial disclosures and resisted producing such Declarations to Plaintiffs in discovery on grounds of work product and attorney-client privilege; and (c) Defendant's attorneys' conduct violates Alabama Rules of Professional Conduct concerning truthfulness, communications with third parties, and dealings with unrepresented persons.

In support of these objections, Plaintiffs submit counter-declarations (the "Counter-Declarations") from 19 named and opt-in plaintiffs dated July 2008.  (*See* doc. 54, at Exhs. 9-27.)  Each of these virtually identical Counter-Declarations includes a statement that the declarant is a present employee of HL-A, and that he or she was called into a meeting with HL-A's attorney(s) and told "that HL-A was conducting a survey and that I needed to answer questions and sign a statement."  Each of the 19 Counter-Declarations further states that, "I did not really understand what they were asking about," "I did not understand what my rights were at that time," "I felt intimidated in this meeting," "I felt I had no choice but to sign the document," and "I did not feel that I could leave the meeting or refuse to sign the document without a negative consequence at work."  Each of the counter-declarants had previously signed a declaration for HL-A, such that there are now dueling declarations signed by the same 19 would-be plaintiffs, with one set having been prepared by HL-A's lawyers in January 2008, and the other set having been prepared by Plaintiffs' attorneys in July 2008.  The result is something of a legal tug'o'war, with putative class members caught in the middle as attorneys for both sides jockey for position by sculpting and shaping their testimony in the manner most favorable to one

---

[11]    Of course, many of these declarants later filed consents or became named plaintiffs sometime after signing a declaration for HL-A.  Based on this sequence of events, there is no reason to believe that Defendant improperly contacted represented parties; rather, the challenged contact predated any involvement of Plaintiffs' counsel with those particular declarants.  Plaintiffs do not maintain otherwise.

side or the other.

2.   <em>Defendant Procured the Declarations Improperly.</em>

After careful consideration of the parties' respective briefs and exhibits, as well as study of the relevant authorities, the Court concludes that the Declarations were obtained improperly.

As an initial matter, it is quite clear that a defendant in a § 216(b) action is not categorically forbidden from communicating with prospective opt-in plaintiffs.  Indeed, one prominent commentator has observed that "[d]efendants ordinarily are not precluded from communications with putative class members ...."  5 A. Conte & H. Newberg, *Newberg on Class Actions* § 15:9 (4th ed.) (citation omitted); *see also Parks v. Eastwood Ins. Services, Inc.*, 235 F. Supp.2d 1082, 1085 (C.D. Cal. 2002) (as a general proposition, "[b]ased on the provisions of § 216(b) and the similar Rule 23 pre-certification situation, ... there is no prohibition against pre-'opt-in' communication with a § 216(b) potential plaintiff").  Thus, in *Kerce v. West Telemarketing Corp.*, 575 F. Supp.2d 1354 (S.D. Ga. 2008), the district court declined to strike 16 employee declarations collected by the defendants at the pre-certification phase of a § 216(b) action, reasoning that "prior to a decision on the conditional certification question, each side has the right to communicate with potential class members" and "there is nothing improper about [an employer] gathering facts to support its defense."  *Id.* at 1366.  Without question, then, there is no mandatory, across-the-board prohibition against employer contact with prospective class members in an FLSA collective action at the pre-certification stage.  As a general matter, employers are free to communicate with unrepresented prospective class members about the lawsuit and even to solicit affidavits from them concerning the subject matter of the suit.

Notwithstanding the foregoing, district courts are empowered with relatively broad discretion to limit communications between parties and putative class members.  *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1201-03 (11th Cir. 1985) (recognizing district court's authority to police class member contacts and to prohibit defendant from engaging in unsupervised, unilateral communications with plaintiff class members to solicit exclusion requests from Rule 23 class); *Jones v. Casey's General Stores*, 517 F. Supp.2d 1080, 1088 (S.D. Iowa 2007) ("[T]his Court has relatively broad discretion in limiting communications with putative collective members when such communications cross the boundaries of propriety, including when the communications are unbalanced, misleading, or factually inaccurate.");

-9-

*Maddox v. Knowledge Learning Corp.*, 499 F. Supp.2d 1338, 1342-43 (N.D. Ga. 2007) (observing that district courts in § 216(b) actions rely on broad case management discretion to allow pre-notice communications "while actively limiting misleading statements in such communications"); *Belt v. Emcare, Inc.*, 299 F. Supp.2d 664, 667 (E.D. Tex. 2003) ("As in Rule 23 class actions, courts have the authority to govern the conduct of counsel and parties in § 216(b) collective actions.").

Although district courts are empowered to restrict communications in a class action, that power must be used sparingly because of the substantial First Amendment considerations triggered by any such restraints. Indeed, the Supreme Court has held that courts "may not exercise the power without a specific record showing by the moving party of the particular abuses by which it is threatened" and must give "explicit consideration to the narrowest possible relief which would protect the respective parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) (citation omitted). Stated differently, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. That weighing of competing factors should "result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102. Thus, to be entitled to relief from contacts by an adverse party of prospective class members, a movant must show (1) "that a particular form of communication has occurred or is threatened to occur" and (2) "that the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation." *Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.*, 214 F.R.D. 696, 697-98 (S.D. Ala. 2003).

Federal courts have routinely exercised their discretion to restrict communications in class actions, in both the Rule 23 and § 216(b) settings, where a party has engaged in misleading or coercive behavior with respect to prospective class members. *See, e.g., Maddox*, 499 F. Supp.2d at 1344 ("it is within the court's discretion to prohibit [counsel for the plaintiffs] from

issuing pre-certification statements that are factually inaccurate, unbalanced, or misleading").[12]
By contrast, where a party has not engaged in misleading, coercive or otherwise abusive
communications, district courts have refrained from imposing any such restrictions. *See, e.g.,*
*Kerce*, 575 F. Supp.2d at 1367 (declining to strike employee declarations collected by employer
in the absence of any showing that employer "misrepresented facts about the lawsuit,
discouraged participation in the suit, or undermined the class' confidence in, or cooperation with,
class counsel"); *Payne v. Goodyear Tire & Rubber Co.*, 207 F.R.D. 16, 21 (D. Mass. 2002)
(declining to impose restrictions on defendant's pre-notice contact with potential class members
where record contained no evidence that defendant was pressuring plaintiffs "or covertly robbing
plaintiffs of their opportunity to participate in the instant litigation").  In tracing out the fault line
between conduct which warrants restrictions and conduct which does not, it bears emphasis that
mere inherent coerciveness in the employment relationship is insufficient, in and of itself, to
warrant imposition of limitations on employers' ability to speak with potential class members
prior to certification. *See Gulf Oil*, 452 U.S. at 104 (noting that "mere possibility of abuses does
not justify routine adoption of a communications ban"); *Kerce*, 575 F. Supp.2d at 1366
(concluding that there is nothing improper about employer gathering facts to support a defense
by speaking with and securing declarations from employees).

　　　Plaintiffs have made a compelling showing that, in procuring the 245 Declarations from
putative class members, HL-A engaged in conduct that would reasonably be expected to mislead
and deceive the prospective plaintiffs concerning the nature, purposes and implications of their

---

[12]　　　*See also Jones*, 517 F. Supp.2d at 1089 ("[O]ne-sided, misleading
communications with putative opt-in collective members ... could easily have the effect of
tainting the entire putative class and jeopardizing this entire litigation."); *Sjoblom v. Charter
Communications, LLC*, 2007 WL 5314916, *3 (W.D. Wis. Dec. 26, 2007) ("Abusive practices
that district courts have considered sufficient to warrant a protective order include
communications that coerce prospective class members into excluding themselves from the
litigation; contain false, misleading or confusing statements; and undermine cooperation with or
confidence in class counsel."); *Belt*, 299 F. Supp.2d at 667 ("Courts have found a need to limit
communications with absent class members where the communications were misleading,
coercive, or an improper attempt to ... encourag[e] class members not to join the suit."); *see
generally* 5 *Newberg on Class Actions*, at § 15:9 ("Defendants ... may not give false or
misleading information or attempt to influence class members in making their decision whether
to remain in the class.") (citation omitted).

participation in the declaration process.  Plaintiffs' exhibits establish that each declarant was called individually into a meeting with defendant's attorney(s) during work hours, and was informed that HL-A "was conducting a survey."  (Doc. 54, at Exhs. 9-27.)  That representation was, at best, highly misleading.  HL-A was not "conducting a survey" for academic, internal or informational purposes.  Instead, it was marshaling data to use against all of its hourly workers (including the declarants themselves) in litigation.  Armed with this data, HL-A intended to seal off all 245 declarants from participating in this lawsuit and to combat their claims to the extent that they are permitted to, and elect to, opt in.  Of critical importance, HL-A's lawyers neither informed the declarants that a class action lawsuit concerning the very pay practices about which they were being "surveyed" was pending, nor that those declarants were themselves potential class members whose execution of a form declaration for HL-A might effectively strip them of an opportunity to join in the lawsuit.  (*Id.*)  Rather than receiving fair and reasonable disclosure of the purposes and potential consequences of their ostensibly voluntary cooperation with HL-A, the declarants were duped into believing that they were participating in an innocuous "survey" without being alerted that their cooperation with HL-A and their execution of a declaration might compromise and waive their rights, and prevent them from participating in a class action lawsuit whose existence HL-A had covertly concealed from them.  Such unabashedly deceptive activity is exactly the type of misleading communication that has prompted federal courts to step in and regulate communications with potential class members prior to the certification of a § 216(b) class.  *See, e.g., Sjoblom v. Charter Communications, LLC*, 2007 WL 5314916, *3 (W.D. Wis. Dec. 26, 2007) (finding that "defendants' less than full disclosure of the affiants' potential interest in this lawsuit" in "blitz campaign of affidavit gathering" warranted granting relief to plaintiffs); *Mevorah v. Wells Fargo Home Mortg., Inc.*, 2005 WL 4813532, *3 (N.D. Cal. Nov. 17, 2005) ("this court has restricted a defendant's ability to communicate with potential class members following the defendant's publication of a notice that ... failed to disclose the pendency or scope of the class action and may have caused confusion among potential class members regarding their rights").

Faced with this specific showing that the Declarations were obtained under false pretenses, HL-A does not deny telling the employees that they were being interviewed for a "survey"; to the contrary, Defendant candidly concedes that this cover story was used.  (Doc. 57,

at 17.)[13]  Nor does Defendant maintain that it ever disclosed to the declarants the existence of

this lawsuit, their status as potential opt-in class members, or the possible repercussions of their

participation in the "survey" on their right to participate in such lawsuit.[14]  And Defendant never

suggests that it lacked awareness of the pendency of this action or its § 216(b) opt-in collective

action status at the time that it conducted these interviews and obtained these Declarations.

      In sum, then, the court file establishes a clear record of abusive communication by HL-A

---

[13]        To be sure, Defendant weakly contends, "HL-A's counsel <u>was</u> taking a survey of HL-A's pay practices."  (Doc. 57, at 28.)  Be that as it may, this "survey" happened to coincide with the filing of this FLSA collective action, was focused on the precise pay practices being litigated in this action, was isolated to prospective class members, and formed the centerpiece of HL-A's opposition to conditional class certification.  Under any rational viewing of these facts, HL-A misled and deceived the prospective plaintiffs to elicit their cooperation in interviews and their execution of Declarations with no inkling that HL-A intended to use the information gleaned to freeze them out of this litigation.  That Defendant may rationalize its disingenuousness by suggesting that it merely told its employees a half-truth or a sugarcoated version of the truth to quell any suspicions in no way mitigates or excuses the patently misleading nature of the communications.  As for Defendant's feigned indignation that "[s]urely Plaintiffs are not contending that their responses to questions about their pay would depend on whether they knew there was the potential of personal financial gain" (doc. 57, at 10), apparently in furtherance of the notion that its misrepresentations and half-truths are no big deal and should not matter, the Court strongly disagrees.  This is not a "no harm, no foul" scenario.  If informed of the truth about why they were being asked questions and being instructed to sign Declarations, employees might have chosen not to participate.  They might have scrutinized the largely "boilerplate" document placed before them for execution more carefully.  They might have asked more questions.  They might have done a host of different things to protect themselves and preserve their rights from incursion by Defendant's attorneys in a slanted playing field via secretive tactics.  Despite HL-A's attempts to trivialize them, Defendant's misleading statements and nondisclosure of the true reasons for the interviews and Declarations matter.  A lot.

[14]        To the contrary, HL-A specifically represents that it "did not discuss the lawsuit" with employees at the time of the interviews and execution of the Declarations.  (Doc. 57, at 10.)  It is thus undisputed that Defendant furnished no information to the declarants that there was a pending lawsuit (in which they might be eligible class members) concerning the very issues on which they were being "surveyed" and that their "survey" responses might have a deleterious impact on their rights in such lawsuit.  Although HL-A protests that it did not wish to place itself in the precarious position of dispensing legal advice to unrepresented adverse parties, no one is suggesting that HL-A should have done so.  At a minimum, however, HL-A should have disclosed the fact of this litigation and each declarant's potential right to participate in it, as well as alerted them to the possibility that those rights might be adversely affected if the declarant cooperated with HL-A's "survey."  Instead, HL-A chose a path of nondisclosure and ambush.

to prospective opt-in plaintiffs.  Knowing that this lawsuit was pending and that it was styled as a § 216(b) opt-in proceeding, Defendant called each of its hourly workers into a one-on-one meeting during work hours with its attorney(s), creating an inherently coercive and intimidating environment for interviews and execution of paperwork concerning pay practices.  Defendant's attorneys asked general questions about pay practices and placed a largely form document in front of each employee to be signed.  While that inherently coercive setting is not itself grounds for relief, Defendant's misleading statements to these potential plaintiffs about the reasons for the interview and declaration process, and their suppression of the truth, were obviously designed to lull prospective plaintiffs into a false sense of security and to effectuate their complete cooperation with minimal resistance.  Such manipulation of unrepresented parties to secure Declarations that HL-A now uses for the purpose of preventing the very people it misled from being able to litigate their FLSA rights herein is improper.[15]

> 3.      *Striking the Declarations is an Appropriate and Reasonable Sanction.*

District courts possess inherent power to sanction errant litigants.  *See Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("Courts have the inherent authority to control the proceedings before them, which includes the authority to impose "reasonable and appropriate" sanctions."); *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001) ("All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders.").  "To impose sanctions under these inherent powers, the court first must find bad faith."  *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008).  The requisite bad faith may be found to exist where an attorney "disrupt[s] the litigation."  *Id.* (citation omitted); *see also Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001) ("A false statement can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement

---

[15]      To be clear, the Court does not find that HL-A was not permitted to meet with its employees, to ask them questions about the issues animating this lawsuit, or to request that they sign declarations.  In general, such communications are entirely permissible and appropriate.  But when HL-A's attorneys expressed misleading half-truths to these employees about the *raison d'être* for the meetings and declarations, they crossed a clear line demarcated in *Gulf Oil* and its progeny.  It is that aspect of Defendant's conduct for which sanctions and restrictions are warranted.

was made for a harassing or frivolous purpose."). Courts have imposed the sanction of excluding or striking evidence where that evidence was improperly obtained. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (where defendant made payments to fact witnesses in violation of rules of professional conduct, district court's sanction of barring all evidence tainted by ethical violations was an adequate penalty and not an abuse of discretion); *Sjoblom*, 2007 WL 5314916, at *4 (in FLSA collective action, where defendant obtained numerous affidavits from potential class members in blitz campaign and "advised potential class members that the lawsuit at issue was a class action, [but] did not notify them that they might be entitled to become a part of the lawsuit," remedy was for affidavits to be struck for want of full disclosure to affiants); *Parker v. Pepsi-Cola General Bottlers, Inc.*, 249 F. Supp.2d 1006 (N.D. Ill. 2003) (where attorney violated anti-contact rule, district court exercised inherent powers to sanction party by barring it from using evidence obtained thereby).

For the reasons stated in the preceding section, the Court finds that the January 2008 interviews conducted by defense counsel of putative opt-in plaintiffs concerning the subject matter of this dispute were both improper and exhibited bad faith, thereby warranting the imposition of sanctions. Through misleading communications and nondisclosure of the true reason for those interviews, Defendant treated putative plaintiffs unfairly and irrevocably tainted the Declarations procured by dint of that deception. In light of this determination, the 245 Declarations (found at Exhibit 13 to document 48) obtained by Defendant during its January 2008 declaration-gathering campaign are hereby **stricken** and may not be used for any purpose in this litigation.[16]

4.       *Plaintiffs' Request for Protective Order.*

As the foregoing discussion demonstrates, on January 15 and 16, 2008, Defendant's attorneys obtained Declarations from 245 potential opt-in plaintiffs under the guise of conducting a "survey" of pay practices, without mentioning the then-pending § 216(b) lawsuit or

---

[16]       Given this ruling, the Court need not and does not reach the alternative bases for relief articulated in Plaintiffs' Motion to Strike, to-wit: that the Declarations should be struck as a discovery sanction, or pursuant to certain enumerated Alabama Rules of Professional Conduct.

the declarants' potential right of participation therein.  Based on these facts, the Court finds that Defendant engaged in communications with prospective class members that were abusive and that threatened the proper functioning of this litigation.  As such, some restriction on Defendant's contact with prospective class members concerning the subject matter of this litigation is necessary and appropriate pursuant to *Gulf Oil* principles to safeguard and preserve the integrity of these proceedings.  The remaining question is what restriction is warranted.[17]

In their Motion for Protective Order, Plaintiffs ask the Court to "prohibit[] any further unilateral communication between Defendant and/or its attorneys and existing putative class members." (Doc. 52, at 3.)  This extremely broad formulation of the relief requested disregards the Supreme Court's admonition that any protective order issued in this context must give "explicit consideration to the narrowest possible relief which would protect the respective parties." *Gulf Oil*, 452 U.S. at 102.  An across-the-board ban on communications with putative class members may be appropriate where the abusive contact consists of telling lies to persuade an employee not to opt in, threatening an employee with discharge if she does opt in, falsely disparaging plaintiff's counsel to the employee to discourage her from opting in, or similarly egregious conduct that may poison the litigation to its core.  Here, by contrast, there is no evidence and no reason to believe that HL-A or its attorneys has spread falsehoods or coercive threats to employees to dissuade them from joining in this lawsuit.  Rather, the particular abusive practice at issue is HL-A's use of overzealous declaration-gathering techniques.  There being no reason to believe that different or more severe abuses are threatened or reasonably likely here, it is that harm, and that harm only, to which the protective order shall be tailored, because any broader restriction would go further than necessary to ward off the potential abuse.

Accordingly, it is **ordered** that any contact Defendant or its attorneys may have with unrepresented potential class members, between now and the trial of this action, for the purposes of investigating Plaintiffs' claims, preparing a defense, gathering evidence or executing declarations must be preceded by full written disclosure to the witness.  Should Defendant or its

---

[17]     HL-A's filings leave no doubt of its intention to continue its communications with prospective class members.  Indeed, Defendant cryptically states that it will "communicate with its employees in the future regarding a variety of subjects."  (Doc. 57, at 19.)  Presumably, those subjects include the pay practices being litigated in this lawsuit.

attorneys wish to contact unrepresented potential class members for these investigative, fact-gathering, and/or evidence-generating purposes, they must first provide each witness contacted with a written disclosure form.  In addition to the caveats about voluntariness, noncoercion and the like that HL-A inserted in the now-stricken Declarations, this form must, at a minimum, disclose the existence and nature of this litigation, the witness's potential right to inclusion therein as an opt-in plaintiff, and the possibility that cooperation with Defendant's investigation may adversely affect the witness's right to participate and recover compensation in this litigation.[18]  It is not necessary that the disclosure form identify Plaintiffs' counsel by name, provide his contact information, endorse him, or advise the witness to speak with him or any other attorney before cooperating with Defendant.  The disclosure form must be presented to, signed and dated by each prospective class member as a precondition to any investigation, fact-gathering or evidence-creating activities by Defendant or its counsel directed at that individual; moreover, the individual must also be given a copy of the form to take with him or her at the conclusion of any such contact with Defendant or its counsel.  Simply put, if Defendant or its lawyers wish to interview a prospective class member about this case, they cannot do so unless and until they have obtained a signed, dated disclosure statement from that individual in a form jointly agreed upon by the parties and consistent with the foregoing.[19]

**III.   Legal Framework for Conditional Class Certification.**

Pursuant to Section 216(b) of the FLSA, an action to recover unpaid minimum wage or overtime compensation "may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or

---

[18]     If and when Defendant wishes to move forward with such interviews or meetings with prospective class members, it should work with Plaintiffs' counsel to prepare a mutually acceptable disclosure form consistent with the guidance presented herein.  To the extent that the parties are unable in good faith to agree on the disclosure form's content, this Court will assist them upon proper application.

[19]     This protective order "is sensitive to the First Amendment because: (1) it does not interfere with communications unrelated to the current action and concerning the ongoing business relationship between Defendants and the potential class members; (2) its duration is appropriate ... ; and (3) any less restrictive order would not effect the collective action's purposes."  *Belt*, 299 F. Supp.2d at 669.

-17-

themselves *and other employees similarly situated.*"  29 U.S.C. § 216(b) (emphasis added).  In

contrast to the traditional Rule 23 framework in which similarly situated persons' interests may

be litigated without their formal consent, the FLSA features an opt-in mechanism for similarly

situated employees.  *See id.*  ("No employee shall be a party plaintiff to any such action *unless*

*he gives his consent in writing to become such a party and such consent is filed in the court in*

*which such action is brought*.") (emphasis added).  The Eleventh Circuit has repeatedly

recognized this distinction.  *See Anderson v. Cagle's, Inc.*, 488 F.3d 945, 950 n.3 (11th Cir. 2007)

("Unlike class actions governed by Rule 23 ..., FLSA collective actions require potential class

members to notify the court of their desire to opt in to the action."); *De Leon-Granados v. Eller*

*and Sons Trees, Inc.*, 497 F.3d 1214, 1219 (11th Cir. 2007) ("in an FLSA action, a party plaintiff

must opt into an action, whereas in a Rule 23(b)(3) class action, all qualifying class members

become party-plaintiffs unless they opt out").  Plaintiffs now seek permission to conduct this

action as an opt-in collective action under § 216(b), with prospective opt-in plaintiffs being

given notice and an opportunity to join these proceedings.  It is for that purpose that Plaintiffs

request class certification status.  Both the conditional certification of an FLSA class and the

issuance of court-supervised notice to members of such class hinge on satisfaction of the

"similarly situated" requirement of § 216(b).  *See, e.g., Reed v. Mobile County School System*,

246 F. Supp.2d 1227, 1230 (S.D. Ala. 2003).[20]

 The legal standards and parameters by which an FLSA class certification request is to be

evaluated are well settled.  Last year, the Eleventh Circuit had occasion to summarize the

---

  [20] To be sure, the "similarly situated" element is not the sole precondition for
conditional class certification under the FLSA.  The Eleventh Circuit has recognized as a
separate requirement that "the district court should satisfy itself that there other employees of the
department-employer who desire to opt-in" before conditionally certifying a class.  *Dybach v.
State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991); *see also Saxton v. Title
Max of Alabama, Inc.*, 431 F. Supp.2d 1185, 1187 (N.D. Ala. 2006) ("The two judicial inquiries
for the court to make are: (i) whether there are other employees of the employer who wish to opt-
in; and (ii) whether these employees are similarly situated ...."); *Holt v. Rite Aid Corp.*, 333 F.
Supp.2d 1265, 1269 (M.D. Ala. 2004).  Here, HL-A has not contested Plaintiffs' showing that
other employees desire to opt-in, nor could it reasonably do so, given that Plaintiffs have filed
roughly 80 consent forms from putative opt-in plaintiffs.  Therefore, it is unnecessary to examine
this element further, and the analysis will focus on the "similarly situated" inquiry.

applicable legal framework in *Anderson v. Cagle's, Inc.*, 488 F.3d 945 (11th Cir. 2007), wherein the panel explained that, "[t]o maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated." *Id.* at 952 (citations and internal quotations omitted).  In ascertaining whether the "similarly situated" requirement has been satisfied, the Eleventh Circuit has endorsed (without mandating) a pragmatic two-stage approach.  "[A]t the initial stage the district court's decision to certify a class is based primarily on pleadings and affidavits," such that the court should adopt a "fairly lenient standard for determining whether the plaintiffs are truly similarly situated." *Id.* at 953 (citations and internal quotations omitted).  At this stage, "[b]ecause the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in conditional certification of a representative class," such that "putative class members are given notice and the opportunity to opt-in" and the action proceeds as a representative action in discovery.  *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (citations omitted); *see also Grayson v. K Mart Corp.*, 79 F.3d 1086, 1079 (11th Cir. 1996) (plaintiffs' burden at the initial stage "is not heavy"); *Kerce*, 575 F. Supp.2d at 1358 ("Typically, courts presented with motions to conditionally certify a class under § 216(b) grant those motions and allow the case to proceed to discovery.").  The first-stage "fairly lenient" standard "may be most useful when making a certification decision early in the litigation before discovery has been completed." *Anderson*, 488 F.3d at 952.  Such is the posture of the case at bar; therefore, the fairly lenient standard approved in *Anderson* and *Hipp* will be applied here.[21]

That leaves the question of how, exactly, a district court is to determine whether the named plaintiffs and putative opt-in plaintiffs are in fact sufficiently similar for § 216(b)

---

[21]     Looking ahead, if conditional class certification is granted, the second stage of the process occurs when a defendant files a decertification motion after discovery has been substantially completed and the case is ready for trial.  *See Anderson*, 488 F.3d at 953; *Hipp*, 252 F.3d at 1218.  At that time, "the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Anderson*, 488 F.3d at 953 (citation omitted).  Significantly, "the similarly situated standard at the second stage is less lenient than at the first, as is the plaintiffs' burden in meeting the standard." *Id.* "If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice," after which the original named plaintiffs proceed to trial on their individual claims. *Hipp*, 252 F.3d at 1218 (citation omitted).

purposes to warrant conditional class certification.  Binding authorities do not fix the line of demarcation with crystalline clarity, nor could they reasonably formulate a one-size-fits-all approach, given the myriad case-specific factors that may propel the substantial similarity inquiry in a particular action.  *See generally Gerlach v. Wells Fargo & Co.*, 2006 WL 824652, *1 (N.D. Cal. Mar. 28, 2006) (noting that FLSA does not define "similarly situated" and there is little circuit law doing so).  For example, what constitutes substantial similarity in a case about whether particular employees are or are not exempt from the FLSA may be very different than what constitutes substantial similarity in a case about an employer's time-rounding policies.  Nonetheless, several guiding principles shine through.  First, "the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions."  *Anderson*, 488 F.3d at 953 (citation omitted).  Second, plaintiffs' burden of showing classwide similarity "is not heavy" and may be satisfied "by making substantial allegations of class-wide [FLSA violations], that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."  *Hipp*, 252 F.3d at 1219 (citations omitted); *see also Ruggles v. Wellpoint, Inc.*, --- F.R.D. ----, 2008 WL 4866053, *5 (N.D.N.Y. Nov. 6, 2008) (explaining that plaintiffs at initial stage need only make a "modest factual showing" demonstrating that they and potential class plaintiffs "were victims of a common policy or plan that violated the law," with plaintiffs' burden being "minimal because the determination that the parties are similarly situated is merely a preliminary one that may be modified or reversed at the second stage") (citation omitted).  Third, district courts are vested with substantial discretion in making class certification decisions.  *See Anderson*, 488 F.3d at 951, 953-54; *Hipp*, 252 F.3d at 1219 (decision to create a § 216(b) opt-in class "remains soundly within the discretion of the district court").

IV.     **Motion for Conditional Class Certification.**

      A.     *Plaintiffs' Showing of Substantial Similarity.*

Plaintiffs argue that conditional class certification is appropriate because there are other employees who desire to opt in and who are similarly situated to the six named plaintiffs with respect to the particular unpaid overtime compensation issues implicated by the Amended Complaint.  As mentioned *supra*, the claimed FLSA violations are that (1) HL-A has a policy of requiring or permitting its hourly employees to work "off the clock" both before and after their

shifts, (2) HL-A has a policy of failing to pay its hourly employees for work performed during their lunch breaks and of deducting 30 minutes from their pay each day for a meal period that is not *bona fide*, and (3) HL-A has a policy of consistently and systematically rounding hours down (in Defendant's favor), thereby artificially reducing hours paid relative to hours worked for all of its nonexempt hourly employees.  Plaintiffs have submitted detailed allegations supported by affidavits on each of these points.

With regard to pre- and post-shift work, the Amended Complaint alleges that HL-A's hourly employees "typically clock in up to 30 minutes before the start of their shift, and begin work," yet HL-A does not compensate them until the scheduled start of the shift, "causing Plaintiffs and other similarly-situated employees to work off the clock" during the interim. (Amended Complaint (doc. 37), ¶¶ 19, 20.)  The Amended Complaint further alleges that Plaintiffs and other similarly situated employees regularly begin work prior to the start of their scheduled shifts, and sometimes stop working after the end of their scheduled shifts, but are not paid for those hours of work and do not receive overtime compensation for those hours in weeks in which they work more than 40 hours.  (*Id.*, ¶¶ 38-42.)  In support of these allegations, Plaintiffs have submitted 30 declarations executed by named and prospective opt-in plaintiffs. (Doc. 40, at Exhs. 1-30.)[22]  These declarations provide evidentiary support for the proposition that hourly employees at HL-A (a) typically begin work promptly after arriving at work, but are not paid until the start of their scheduled shift, and (b) often do not stop working until after their scheduled shift ending time, but are not paid for work performed after that ending time.

Next, concerning lunch breaks, the Amended Complaint alleges that "Plaintiffs and similarly situated employees had deducted from their compensable time for the work day thirty minutes for lunch, regardless of whether they took the lunch or not.  Management of Defendant suffered and permitted this practice even though management was aware of the fact that Plaintiff

---

[22]     This set of declarations, like many others submitted in this case, consists largely of "boilerplate" form documents, with minimal tailoring to the specific circumstances of the individual.  While these form declarations will be accepted as filed, it is suggested to both sides that declarations are far more helpful and enlightening to the extent they are molded and personalized to the circumstances of the individual declarant, rather than amounting to a signature on a generic mass-produced form drafted by counsel.

and similarly situated employees were working off the clock during some of these thirty minutes scheduled work breaks." (Amended Complaint, ¶ 26.) The Amended Complaint further alleges that those automatic meal deductions create unpaid overtime situations where employees work at least 40 hours per week in addition to uncredited time worked during lunch breaks. (*Id.*, ¶¶ 29-30.) Most (but not all) of the 30 employees who submitted declarations in support of the Motion for Conditional Class Certification state that they were interrupted during lunch breaks for work needs (many of them frequently), but were not compensated for that time. (Doc. 40, at Exhs. 1-30.)

Finally, as to rounding policies, the Amended Complaint alleges that if an employee swipes a time card early or late at the beginning of a shift, before or after a meal break, or at the end of the shift, his or her compensable time is rounded to the 15-minute increment most favorable to the company. (Amended Complaint, ¶¶ 22-25.)[23] As Plaintiffs put it, "[i]nstead of properly rounding both up and down to the nearest fifteen minutes, Defendant rounds for its own benefit, in effect working employees off the clock." (*Id.*, ¶ 35.) To support these allegations, Plaintiffs offer the Declaration of Deborah Longcrier, who confirms the existence and operation of this rounding policy by HL-A. (Doc. 40, Exh. 1, ¶¶ 13-14, 16.) Plaintiffs also submit detailed summaries of samplings of HL-A-provided time clock records that purport to demonstrate the implementation of this rounding policy affecting the compensable hours of plaintiff Longcrier

---

[23]     For example, suppose an employee is scheduled to begin working at 8:00 a.m. According to the Amended Complaint, if the employee clocks in at any time between 8:01 a.m. and 8:14 a.m., her compensable time begins running at 8:15 a.m., such that she loses credit for 15 minutes of work even if she clocks in just one minute late. Similarly, suppose an employee is scheduled to go on lunch break at 12:00 p.m. Per the Amended Complaint, if the employee clocks out for lunch at 11:59 a.m., her compensable time stops running at 11:45 a.m. Department of Labor regulations approve rounding practices that result in time worked being rounded to the nearest quarter hour on the theory that, over time, "this arrangement averages out so that the employees are fully compensated for all the time they actually work." 29 C.F.R. § 785.48(b). By contrast, HL-A's rounding practice, as described in the Amended Complaint, could never "average out" over time, inasmuch as rounding is done to the quarter hour that most favors Defendant, rather than to the <u>nearest</u> quarter hour. As such, the rounding practice described in the Amended Complaint would amount to an FLSA violation because nonexempt employees would not receive 1.5 times their regular hourly wage for hours worked in excess of 40 in a given workweek (*i.e.*, there would be work time for which those employees would be paid nothing rather than the overtime premium pay to which they were entitled).

and numerous other hourly employees, resulting in systematic undercounting of their hours worked on a weekly or even daily basis.  (Doc. 40, Exhs. 35-37.)[24]

       **B.**       *Analysis of Adequacy of Plaintiffs' Showing.*

As the Court has previously explained, Plaintiffs' burden at the conditional class certification stage requires only "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Russell v. Illinois Bell Telephone Co.*, 575 F. Supp.2d 930, 933 (N.D. Ill. 2008) (citation omitted); *see also Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001) (first-round "similarly situated" determination "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan") (citations and internal quotations omitted); *Rubery v. Buth-Na-Bodhaige, Inc.*, 569 F. Supp.2d 334, 337 (W.D.N.Y. 2008).  For example, one district court deemed the first-step threshold satisfied where the plaintiffs offered ample evidence that "most production employees are paid on a gang time basis," such that the plaintiffs and putative class members were similarly situated as to a "single decision, policy or plan" that formed the basis of the alleged FLSA violations.  *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870, 896 (N.D. Iowa 2008).  Likewise, another district court determined that the plaintiffs had satisfied their first-stage

---

[24]     As an example of the kinds of practices documented in these summaries, Plaintiffs' Exhibit 37 shows that on August 29, 2005, employee Jerome Burns clocked in at 6:32 a.m., took half an hour for lunch, and clocked out at 3:15 p.m.  (Doc. 40, Exh. 37, at 3.)  Burns was only paid for eight hours of work that day because, pursuant to HL-A's rounding policy, he was deemed to have begun work at 6:45 a.m., rather than 6:30 a.m.  In other words, when Burns clocked in two minutes after 6:30, HL-A rounded his start time to 6:45 a.m. (the nearest quarter hour that favored the company).  Another example is employee Nicole Brooks, who clocked in at 3:03 p.m. on May 30, 2007, took 30 minutes for a meal break, and clocked out at 11:45 p.m.  (*Id.*)  Brooks was only paid for eight hours of work that day because, when she clocked in at 3:03 p.m., her start time was rounded to 3:15 p.m. for the benefit of the company.  Plaintiffs' Exhibits 35 through 37 are littered with similar examples of these kinds of rounding practices, which Plaintiffs contend are proof that the hours worked by nonexempt employees at HL-A are systematically undercounted, such that employees are not paid 1.5 times their regular hourly rate for all hours worked in excess of 40 in a workweek.  As one might expect, Defendant has a very different interpretation of and explanation for that data.  At this stage, however, it is not appropriate to weigh the evidence and select from competing inferences the one most favorable to the employer.

"substantial similarity" burden by submitting a declaration "confirming that all janitorial and maintenance workers employed by defendant ... have been subjected to a policy that requires them to work through much of their lunch hour, as well as additional hours off the clock." *Bowens v. Atlantic Maintenance Corp.*, 546 F. Supp.2d 55, 82-83 (E.D.N.Y. 2008).

Under any reasonable view of the Amended Complaint and Plaintiffs' exhibits, Plaintiffs have adequately and sufficiently demonstrated that other hourly employees at HL-A are similarly situated to them, in the sense that they are subject to common policies, practices or plans of HL-A that allegedly violate the FLSA. Accordingly, the Court concludes that Plaintiffs have made the requisite modest factual showing to satisfy this fairly lenient standard for purposes of conditional certification.

Defendant's arguments to the contrary are without merit, at least as to the "substantial similarity" requirement at this preliminary stage of the proceedings. Defendant maligns the 30 declarations submitted by Plaintiffs as "conclusory." They are not. Each of those 30 actual or potential plaintiffs states that he or she typically began work immediately upon clocking in, but was not paid until the start of his or her shift. Each states that he or she typically worked after the end of scheduled shifts, but was not paid for that extra unscheduled work time. Most state that the declarant was frequently interrupted during his or her 30-minute lunch break to perform work, but was not compensated or credited for any of that time worked. Far from being conclusory, these declarations constitute a substantial showing that many hourly employees at HL-A are subject to and have been harmed by the same pay practices to which the six named Plaintiffs object in their Amended Complaint.[25]

Next, Defendant argues that Longcrier's own deposition testimony refutes the notion of a

---

[25]    Although Defendant summarily waves off the class members' declarations as conclusory, it is unclear what detail HL-A believes they lack. Each declaration identifies certain common pay practices of HL-A and states that the declarant was personally adversely affected by those policies by having to work off the clock before and after shifts, and during meal breaks. This is not summary judgment. The applicable legal standard for conditional class certification is fairly lenient. Viewed through that lens, any reasonable reading of the 30 declarations offered by Plaintiffs would prompt a preliminary conclusion that the hourly workers at HL-A are similarly situated because they are all subject to and have been adversely affected by the same pay policies and practices which the Amended Complaint alleges are violative of the FLSA.

-24-

common policy regarding pre-shift work by pointing to an excerpt that might support an inference that a group of workers on a different assembly line did not have to report to work early.  (Longcrier Dep., at 102-05.)  This contention misses the point.  Whether those other workers were required to show up early or not, if they did show up and began working before their scheduled shift time (as dozens of Plaintiffs and prospective opt-in plaintiffs have alleged they did), and if HL-A suffered them to work before their scheduled shift times without paying them, then whether it was a company requirement for those employees to report to the job site in advance of their scheduled shift time is probative of nothing.[26]  (*See* footnote 27, *infra*.)

Defendant also insists that Plaintiffs' evidence establishes "that HL-A had no common practice of denying pay for post-shift work."  (Doc. 47, at 12.)  Again, more than two dozen hourly employees at HL-A have attested to the contrary.  While Defendant criticizes Plaintiffs for not backing up these declarations with pay records showing that workers were not compensated for post-shift work and contends that the pay records actually prove otherwise, nothing in the applicable legal standard requires Plaintiffs to present multiple overlapping and mutually reinforcing forms of proof on the same point at the conditional class certification stage.  As such, Defendant would have this Court impose on Plaintiffs a degree of exhaustive precision at this stage that the law does not.  And to the extent that Defendant would have this Court make credibility determinations concerning the veracity of the 30 declarations, it is manifestly inappropriate to do so at this juncture.  By the same token, HL-A's contention that it "had no common practice of interrupting lunch breaks among associates in the potential class" (doc. 47, at 13) falls flat because it disregards the allegations of the Amended Complaint and the 30 declarations that are to the contrary.  Defendant's suggestion that Plaintiffs have failed show any

---

[26]       Likewise, Defendant's reliance on Longcrier's testimony that "every area is different" with respect to pre-shift procedures takes that testimony out of context and perhaps distorts its meaning.  The actual exchange reflects that Longcrier's assertion that "every area is different" was made in response to a series of questions about "different tasks performed in the different departments."  (Longcrier Dep., at 80.)  Given the vagueness of the question and the fact that it was arguably geared to "tasks" rather than pre-shift procedures, Longcrier's testimony on this point is, at best, ambiguous, and cannot overcome the 30 declarations from putative plaintiffs who maintain that they began work immediately after arriving at HL-A's premises each day but were not compensated until their scheduled shift start time.

similarity among putative class members with regard to "off the clock" work likewise ignores the Amended Complaint and the 30 declarations that say otherwise.[27]

In addition to criticizing Plaintiffs' evidence, HL-A comes forward with an extensive affirmative showing of its own to refute the "substantial similarity" allegations and evidence of Plaintiffs.  Specifically, Defendant presents evidence that the hourly positions held by putative class members cover a wide range of job titles, duties, pay ranges, and supervisors.  Defendant offers declarations from supervisors and human resources officials showing that operations, start times, schedules, and shift procedures may vary considerably from one department to the next.  (Doc. 47, at 14-16.)  Defendant denies the existence of any company policy concerning pre-shift work or lunch break work, instead attributing those decisions solely to the discretion of individual supervisors.  (*Id.* at 21.)  Be that as it may, Plaintiffs' 30 declarations (which cut across multiple nonexempt job classifications) and Amended Complaint allegations amount to a substantial showing that all HL-A nonexempt employees are treated similarly and are subject to the same pay practices and policies with regard to "off the clock" work, rounding, and unpaid work/interruptions during meal breaks.  At most, Defendant's evidence may create disputes of fact as to whether all hourly employees are or are not subject to the same policies.  Those factual disputes may properly be addressed after discovery at the second stage of the FLSA collective action process (if and when HL-A files a motion to decertify and the level of scrutiny is

---

[27]     In that regard, Defendant argues that "Longcrier is the only individual among all the declarants who testifies she was required to work off the clock."  (Doc. 47, at 13.)  But all the declarants say that (a) they did work off the clock, and (b) they were not compensated for such efforts.  Whether HL-A "required" Plaintiffs to work off the clock is not an element of Plaintiffs' FLSA causes of action; rather, all that is necessary is that Defendant suffered its hourly employees to work in that fashion.  *See, e.g., Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007) ("It is not relevant that the employer did not ask the employee to do the work.  The reason that the employee performed the work is also not relevant."); *Falcon v. Starbucks Corp.*, --- F. Supp.2d ----, 2008 WL 155313, *4 (S.D. Tex. Jan. 15, 2008) ("An employer must compensate employees for all work it suffers or permits."); 29 C.F.R. § 785.13 (employer "cannot sit back and accept the benefits without compensating for them").  Simply stated, "[w]ork not requested, but suffered or permitted is work time. ... The reason is immaterial.  The employer knows or has reason to believe that he is continuing to work and the time is working time."  29 C.F.R. § 785.11.  Defendant's apparent position that its employees cannot have viable FLSA claims unless HL-A "required" them to work off the clock is inconsistent with applicable law.

intensified because discovery is complete and the case is ready for trial), but they do not constitute a valid basis for denying conditional class certification today.  *See, e.g., Carmody v. Florida Center For Recovery, Inc.*, 2006 WL 3666964, *4 (S.D. Fla. Nov. 8, 2006) (explaining that it would be improper to indulge in fact-finding determination as to whether the putative plaintiffs conclusively are similarly situated, where pleadings and supporting affidavits alleged facts sufficient to satisfy conditional class certification inquiry).[28]

Defendant also presents a laundry list of alleged infirmities in Plaintiffs' submission, such as the following: (i) lack of evidence that all putative class members' job duties and requirements are similar; (ii) no showing as to how HL-A's job policies or practices caused them as a class to be denied overtime pay; and (iii) failure to submit evidence concerning the work they performed, how long they worked before shifts, why they worked before shifts, whether such work was required by supervisors, and the like.  (Doc. 47, at 20.)  None of these sweeping assertions are persuasive, and some are not even relevant.  If, as Plaintiffs have alleged and shown, they are all harmed by the same company pay policies, then it is of no consequence whether their job duties are similar, what kind of work they performed, why they worked off the clock, and the like.  What matters is that they did work off the clock, that HL-A required or

---

[28]      The same conclusion applies to Defendant's attempt to pit the deposition testimony of plaintiff Longcrier (apparently the only witness whose deposition was taken prior to the Motion for Conditional Class Certification) against the 30 declarations submitted by actual or prospective plaintiffs.  For example, Defendant characterizes Longcrier's testimony as being that "associates were not required to work during lunch breaks or to be back on the line before the end of the break."  (Doc. 47, at 23.)  Assuming that characterization to be accurate, most of the 30 declarations include statements that declarants were frequently interrupted during lunch for work needs.  At this time and on this incomplete record, the Court will not weigh the credibility of Longcrier's testimony versus that of the declarants, nor will the parties' ability to flesh out these issues via the discovery process be pretermitted.  Besides, Defendant selectively omits reference to Longcrier's testimony that she "didn't pay attention" to what other workers did, that she "wasn't keeping tabs on them," and that for her own purposes whenever she finished lunch, "if I came in and I clocked in a few minutes earlier, I went to work.  I didn't wait for the bell to sound. ... [W]henever I clocked in, I'd go back to work."  (Longcrier Dep., at 159, 161.)  That Longcrier's deposition testimony may be shaded in a light favorable to one side or the other on these points is not a basis for disregarding the allegations of the Amended Complaint and the 30 declarations concerning HL-A's lunch break policies and the propensity of nearly all declarants to perform work during lunch breaks without compensation.

permitted them to do so, and that they were not paid statutory overtime that was otherwise due. Plaintiffs have satisfied their modest burden of showing these elements, notwithstanding the missing details on which HL-A would seize.  Moreover, if, as Plaintiffs have shown, HL-A's policies caused them not to receive credit for certain hours worked in weeks when they exceeded 40 hours in a workweek, then the net result is that putative class members were denied overtime pay; therefore, Plaintiffs have clearly shown how they as a class were denied overtime pay.  In arguing otherwise, Defendant would apparently have the Court disregard both the allegations of the Amended Complaint and the 30 declarations that Plaintiffs submitted with their Motion for Conditional Class Certification.  This the Court cannot do.

Defendant also attempts to defeat Plaintiffs' Motion by suggesting that the FLSA violations outlined in the pleadings and record are, at most, isolated or sporadic.[29]  Indeed, Defendant maintains that Plaintiffs' allegations of overtime pay violations are based not on across-the-board policies of HL-A, but instead on occasional deviations from corporate policy by renegade supervisors.  (Doc. 47, at 25.)  The problem, once again, is that HL-A's characterization of the facts cannot be squared with the allegations of the Amended Complaint and the 30 declarations submitted by Plaintiffs, all of which allege and show that the overtime violations in question were not the product of happenstance or outlier instances of rogue behavior by errant supervisors, but were themselves policies (albeit unwritten ones) implemented consistently in a manner that adversely affected all HL-A hourly employees on an ongoing basis.[30]  Courts have rejected similar arguments when confronted with similar evidentiary

---

[29]     HL-A is correct, of course, that class certification is inappropriate where the complained-of behavior consists of infrequent detours from established company policies.  *See Xavier v. Belfor USA Group, Inc.*, --- F. Supp.2d ----, 2008 WL 4900525, *4 (E.D. La. Sept. 23, 2008) (explaining that "mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences"); *Ulysse v. Divosta Bldg. Corp.*, 2006 WL 3618449, *2 (S.D. Fla. Dec. 11, 2006) ("Even if Plaintiff could show that on an isolated occasion and [*sic*] individual supervisor failed to pay him overtime, such an individualized difference from the established policy cannot create commonality between Plaintiff and other plasterers necessary to satisfy the similarly situated requirement.").

[30]     As with many of its previous arguments, HL-A elects to focus on a one-sided, incomplete reading of Longcrier's deposition, to the exclusion of countervailing testimony and

showings.  *See, e.g., Hens v. ClientLogic Operating Corp.*, 2006 WL 2795620, *4 (W.D.N.Y.
Sept. 26, 2006) ("the substantial number of declarations submitted by potential opt-in plaintiffs
belie Defendant's suggestion that the wage violations were isolated rather than systemic").  And
Defendant's related argument that "plaintiffs have not identified a decision, policy or plan that
allegedly resulted in the proposed opt-in class not receiving overtime wages" (doc. 47, at 25) is
simply counterfactual.  The pleadings and affidavits plainly state that HL-A had policies of not
paying its nonexempt workers for "off the clock" work that they frequently performed before
and after their shifts, of intruding on nonexempt workers' lunch breaks to have them perform
work tasks without compensation, and of rounding hours worked in a manner that always
favored the company, thereby systematically understating employees' hours worked.
Defendant's denial of the existence of these policies should not be conflated into a failure by
Plaintiffs to identify any such policies.

   In various places in its briefs, HL-A points to evidence that it contends shows that it did
not violate the FLSA at all.  For example, HL-A asks the Court to find that it "does not round in
the 15-minutes pre-shift or during lunch breaks, and that HL-A has rounded properly at all other

---

with no regard for the 30 declarations (including that of Longcrier herself) that Plaintiffs
submitted in support of their Motion for Conditional Class Certification.  Such selective
emphasis on a narrow slice of the record is inappropriate at this stage.  By way of example, HL-
A relies on an excerpt from Longcrier's deposition that it construes as showing that, except for a
handful of emergency situations, she always received a full 30-minute lunch period.  Defendant
extrapolates from this excerpt that "[c]learly, there was no policy or practice that deprived the
broad proposed class of employees of their lunch period."  (Doc. 47, at 27.)  But in another
portion of her deposition, Longcrier testified that she routinely went back to work as soon as she
clocked in from lunch, such that her clock time accurately reflects the length of her lunch break.
(Longcrier Dep., at 159.)  That clock time shows that she often clocked out for less than 30
minutes (Plaintiffs' Exh. 35), such that she rarely received a full 30-minute lunch period.  The
declarations of Longcrier and some two dozen other current and prospective plaintiffs are
consistent on this point.  Defendant's argument against the existence of any policy concerning
lunch breaks would focus on the sliver of Longcrier's testimony that is most favorable to it,
while ignoring the rest.  Defendant has provided this Court with no authority or argument that
might support such a skewed viewing of the record against Plaintiffs at this preliminary, lenient
notice phase of the proceedings.

times."  (Doc. 47, at 13.)[31]  To the extent that Defendant would now argue the merits of the case, such debates are premature and inappropriate.  *See, e.g., Bouaphakeo*, 564 F. Supp.2d at 893 ("whether at the first or second step in the § 216(b) collective action certification process, plaintiffs need not prove the merits of their claim.  That is, plaintiffs do not have to show that the employer actually violated the FLSA."); *Lynch v. United Services Auto. Ass'n*, 491 F. Supp.2d 357, 368 (S.D.N.Y. 2007) ("a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated"); *Vaszlavik v. Storage Technology Corp.*, 175 F.R.D. 672, 680 (D. Colo. 1997) ("whether plaintiffs can meet their burden in the liability phase ... is irrelevant to the question of § 216(b) certification").  The Court understands and appreciates HL-A's position that it has fully complied with its FLSA overtime obligations with respect to all named and prospective opt-in plaintiffs.  But now is not the time to evaluate the ultimate merits of the causes of action joined in the Amended Complaint, as those findings would have little bearing on the propriety of a threshold conditional class certification.

Defendant's final argument against conditional class certification is that the proposed boundaries of the class (which Plaintiffs' Motion would draw to encompass all current and former hourly employees of HL-A who worked for HL-A within the three years predating the filing of this action) are overly broad.  Defendant explains that such a sweeping class definition would embrace administrative, maintenance, quality, production and warehouse employees, as well as subgroups of same, all of whom may be subject to department-specific procedures and protocols.  To amplify the point, Defendant proffers a series of factors that may influence "[h]ow

---

[31]      This contention apparently flows from HL-A's position that its time clock entries are essentially meaningless in tracking hours worked.  (Doc. 47, at 8-10.)  Defendant maintains that it uses time clock swipes not to track work time or compute pay, but instead merely for safety and attendance purposes.  (*Id.*)  So it is apparently HL-A's position that the time clock records it furnished to Plaintiffs and that form the basis of many of Plaintiffs' FLSA claims are not the payroll records required of it by 29 C.F.R. § 516.2, such that time clock hours and compensated hours do not match for its employees.  The applicable recordkeeping regulation provides that "[e]very employer shall maintain and preserve payroll or other records containing the following information and data with respect to each [nonexempt] employee ... (7) Hours worked each workday and total hours worked each workweek."  § 516.2(a).  If the time clock records over which Plaintiffs have pored are not HL-A's § 516.2 payroll records, then one is left to wonder where those payroll records are and why summaries of them have not been submitted to the Court.  Those obvious and important questions will be left for another day.

the associates start their day and take their lunch," and asserts that lumping these disparate employees into a single § 216(b) action would foster chaos and confusion, rather than efficiency and economies of scale.  (Doc. 47, at 30.)  Contrary to Defendant's insinuation, however, there is no categorical bar on certifying classes that embrace all hourly employees at a facility, nor is there any requirement that the class be artificially confined to a particular segment or subsection of affected employees based on job duties or the like.  The critical inquiry for defining the scope of the class is whether all included prospective class members are similarly situated, meaning that they are all collectively victims of a single policy or plan.  For the reasons stated *supra*, the Court finds that Plaintiffs have made an adequate showing at this preliminary stage to warrant inclusion of all hourly employees in the class definition.  If Plaintiffs' allegations and evidence are credited, the off-the-clock work, lunch break truncation, and rounding policies affect all hourly employees, transcending a particular line, particular job duties, or a particular shift.  Therefore, the Court does not share HL-A's view that the proposed class boundaries are excessively broad, inefficient, unwieldy or otherwise inappropriate.

In sum, while HL-A has aggressively attacked Plaintiffs' factual showing in myriad respects, and while HL-A may have substantial bases for seeking decertification after the close of discovery, Plaintiffs have readily satisfied their minimal burden for conditional class certification.  "Where a plaintiff has demonstrated a reasonable basis for the allegations of the complaint by filing declarations and consents from class members, a collective action is authorized, and notice should be issued."  *Kerce*, 575 F. Supp.2d at 1358.  Plaintiffs have done exactly that.  HL-A's arguments to the contrary too often overlook the lenient standard by which the Motion for Conditional Class Certification must be judged.  Defendant too often picks and chooses the evidence that it likes, while disregarding everything else.  More generally, HL-A has fallen into a common trap for unwary employers confronting FLSA § 216(b) collective actions.  Rather than recognizing the modest threshold appropriate for the first stage and saving its fact-specific arguments for later, "[d]efendants' arguments in their opposition brief focus on the more stringent second tier analysis and raise issues that may be more appropriately addressed on a motion for decertification after notice is given to the proposed class."  *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 468 (N.D. Cal. 2004); *see also Ruggles*, 2008 WL 4866053, at *6 ("At this initial stage where all that is being determined is whether potential opt-in plaintiffs may

be similarly situated, the court does not weigh the ultimate merits of the claims, resolve factual disputes, make credibility determinations, nor decide substantive issues.").  The law erects only a low hurdle for FLSA plaintiffs seeking to obtain conditional class certification and court-facilitated notice to potential class members.  Plaintiffs' showing through its pleadings, its declarations, and its summaries of time records is more than adequate to traverse that hurdle.  Accordingly, a conditional class will be certified and notice will be issued to prospective opt-in plaintiffs.[32]

V.      **Notice to Prospective Opt-In Plaintiffs.**

Concurrently with granting conditional class certification, a district court also has the discretion to implement § 216(b) "by facilitating notice to potential class members."  *Saxton v. Title Max of Alabama, Inc.*, 431 F. Supp.2d 1185, 1186 (N.D. Ala. 2006) (citation omitted); *see also Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991) (concluding that district courts are empowered to give notice to prospective opt-in plaintiffs under § 216(b) of their right to opt in if they so desire, provided that the "similarly situated" threshold is satisfied); *Holt v. Rite Aid Corp.*, 333 F. Supp.2d 1265, 1268 (M.D. Ala. 2004) ("The power to authorize notice must, however, be exercised with discretion and only in appropriate cases.").  Simply put, then, "[i]f the plaintiff makes the requisite modest factual showing, the Court may allow notice of the case to be sent to the similarly situated employees, who then have the opportunity to opt in as plaintiffs."  *Russell*, 575 F. Supp.2d at 933.  The Court agrees that such a procedure is warranted here, and will exercise its discretion to facilitate notice to potential class members.

To facilitate the provision of notice, Defendant is **ordered**, on or before **December 30, 2008**, to produce to Plaintiffs' counsel in a mutually agreeable format (paper or electronic and, if the latter, an ASCII, WordPerfect, Microsoft Word, Excel, or other agreed file format) a list containing the names and current or last known addresses of all current and former nonexempt employees of Defendant whom Defendant employed at any time between January 9, 2005 and

---

[32]      To the extent that further discovery reveals that the opt-in plaintiffs are too disparate, that their claims are individualized and unsuitable for class treatment, or that they are otherwise not "similarly situated," Defendant, of course, remains free to raise those issues via motion to decertify the class following the close of discovery.

the filing of the Complaint on January 9, 2008.[33]

Plaintiffs append to their Motion for Conditional Class Certification a four-page proposed notice styled "Notice of Right to Opt-In to Lawsuit."  (Doc. 38, at Exh. A.)  Plaintiffs propose that this form of Notice be mailed to all putative class members.  Defendant's filings do not address the form or content of the Notice; instead, Defendant requests that if conditional class certification is granted, this Court either direct the parties to agree on the terms of the Notice or authorize Defendant to proffer objections to the proposed Notice.  (Doc. 47, at 31 n.36.)  This request is reasonable.  Accordingly, the parties are **ordered**, on or before **December 30, 2008**, to submit a mutually agreeable form of notice of opt-in rights for the undersigned's approval.  To the extent that the parties are unable to agree, they must file separate proposals on or before that December 30 deadline, explaining the specific differences in their proposals and providing justification for same.[34]

---

[33]     A three-year lookback period is used because Plaintiffs have alleged and made a preliminary showing that Defendant's FLSA violations were willful.  *See* 29 U.S.C. § 255(a) (for claims for unpaid overtime under the FLSA, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued"); *Allen*, 495 F.3d at 1323 ("Although the ordinary statute of limitations in cases brought under the FLSA is two years, a cause of action arising out of a willful violation of the FLSA may be commenced within three years after the cause of action accrued.").  It will be Plaintiffs' burden at trial to show that the alleged violations were willful, so as to trigger the three-year limitations period, rather than the two-year period that would otherwise apply.  *See Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1274 (11th Cir. 2008).

[34]     In collaborating on the joint notice, the parties are instructed to bear in mind the Supreme Court's guidance that "[i]n exercising the discretionary authority to oversee the notice giving process, courts must be scrupulous to respect judicial neutrality.  To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 174, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The parties are further reminded that there are legion authorities containing potentially helpful analysis concerning the proper contours, format and wording of notice in the § 216(b) context. *See, e.g., Russell*, 575 F. Supp.2d at 938-39; *Rubery*, 569 F. Supp.2d at 338; *Bowens*, 546 F. Supp.2d at 84-85; *Gerlach*, 2006 WL 824652, at *4; *Flores v. Lifeway Foods, Inc.*, 289 F. Supp.2d 1042, 1046-47 (N.D. Ill. 2003).  The parties would be well advised to consult these and other decisions in crafting a jointly acceptable form of notice.

**VI.     Plaintiffs' Motion for Equitable Tolling.**

In tandem with their Motion for Conditional Class Certification, Plaintiffs move this Court for an order tolling the statute of limitations on behalf of all potential consenting opt-in plaintiffs.  Plaintiffs' sole reasoning for requesting such relief is that, "[b]ecause several weeks will go by during the briefing schedule and then what time the Court needs to consider Plaintiff's Motion, time will be potentially lost to opt-in Plaintiffs for back pay and liquidated damages." (Doc. 41, ¶ 4.)  Essentially, then, Plaintiffs are asking that the statute of limitations be tolled for prospective class members during the time period in which the Motion for Conditional Class Certification was pending.  However, Plaintiffs' barebones Motion to Toll the Statute of Limitations (doc. 41) provides neither legal authorities nor argument for this request.  To grant that Motion, the Court would either have to take Plaintiffs' word for it that equitable tolling is appropriate in these circumstances, or to conduct Plaintiffs' research and articulate their arguments for them.  Neither approach is acceptable, particularly where Defendant has presented substantial authority for the proposition that equitable tolling is inappropriate in these circumstances.  *See, e.g., Grayson*, 79 F.3d at 1106 (construing § 216(b) as embracing principle that "only a written consent to opt-in will toll the statute of limitations on an opt-in plaintiff's cause of action"); *Pendlebury v. Starbucks Coffee Co.*, 2008 WL 700174, *5 (S.D. Fla. Mar. 13, 2008) (rejecting an argument analogous to that advanced by plaintiffs here, and explaining that "because Plaintiffs have not cited any extraordinary circumstances that prevented the opt-in Plaintiffs in this case from asserting their FLSA rights during the limitations period, the Court declines to equitably toll the statute of limitations period for this case").  "Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  *Wallace v. Kato*, 549 U.S. 384, 127 S.Ct. 1091, 1100, 166 L.Ed.2d 973 (2007).

The Court deems Plaintiffs' meager showing inadequate to justify application of this "rare remedy" in these altogether ordinary circumstances.  To hold otherwise would be to opine that equitable tolling should be granted in every § 216(b) case as a matter of course during the pendency of a conditional class certification request, thereby transforming this extraordinary

remedy into a routine, automatic one.  Plaintiffs' Motion to Toll is **denied**.[35]

## VII.   Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.       Defendant's Motion to Strike Certain Documents (doc. 46) is **denied**.

2.       Plaintiffs' Motion to Strike (doc. 52) is **granted** pursuant to the inherent powers of this Court.  The 245 declarations found at Exhibit 13 to Defendant's Evidentiary Submission (doc. 48) are **stricken** as having been improperly obtained.  Those declarations may not be used for any purpose in this litigation.

3.       Plaintiffs' Motion for Protective Order (doc. 52) is **granted in part** and **denied in part**.  It is **ordered** that any contact Defendant or its attorneys may have with potential class members, between now and the trial of this action, for the purposes of investigating Plaintiffs' claims, preparing a defense, gathering affidavits or executing declarations must proceed in accordance with the specific procedures described in Section II.B.4., *supra*.

4.       Plaintiffs' Motion for Conditional Class Certification and to Facilitate Court-Approved Notice (doc. 38) is **granted**.  The Court hereby **conditionally certifies** an opt-in class consisting of all current and former hourly employees of Defendant whom Defendant employed at any time between January 9, 2005 and the filing of the Complaint on January 9, 2008.

5.       To facilitate the provision of notice, Defendant is **ordered**, on or before **December 30, 2008**, to produce to Plaintiffs' counsel in a mutually agreeable format (paper or electronic and, if the latter, an ASCII, WordPerfect, Microsoft Word, Excel, or other agreed file format) a list containing the names and current or last known addresses of all putative class members.

6.       The parties are **ordered**, on or before **December 30, 2008**, to submit a mutually agreeable form of notice of opt-in rights for the undersigned's approval.  To the

---

[35]       Pursuant to this ruling, any opt-in plaintiff's action against HL-A herein will be considered to be commenced "on the subsequent date on which such written consent is filed in the court in which the action was commenced."  29 U.S.C. § 256(b).

extent that the parties are unable to agree on the form of that notice, they must file separate proposals on or before that December 30 deadline, explaining the specific differences in their proposals and providing justification for same.

7.     Plaintiffs' Motion to Toll Statute of Limitations (doc. 41) is **denied**.


DONE and ORDERED this 9th day of December, 2008.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE